IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| THE FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for WHEATLAND BANK, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | )<br>) Case No.: _____ |
| ONEBEACON MIDWEST INSURANCE COMPANY | )<br>)<br>)<br>) |
| Defendant. | ) |

## COMPLAINT

The Federal Deposit Insurance Corporation, as Receiver for Wheatland Bank ("FDIC-Receiver"), files its Complaint against OneBeacon Midwest Insurance Company ("OneBeacon") and states:

### NATURE OF ACTION

1. This case arises from OneBeacon's failure to make indemnity payments required under a Financial Institution Bond for covered losses suffered by Wheatland Bank ("Wheatland" or "Bank"). The FDIC-Receiver seeks damages resulting from OneBeacon's breach of its contractual obligation under the Financial Institution Bond to indemnify Wheatland for losses resulting from the dishonest and fraudulent conduct of Wheatland's former President and Chief Executive Officer Michael A. Sykes ("Sykes") and former director Arthur P. Sundry, Jr. ("Sundry").

2. Sykes and Sundry fraudulently induced Wheatland to make improper loans by making material misrepresentations and omissions about critical aspects of the loans. Sykes and Sundry personally profited from these loans because the proceeds were used to pay off non-performing loans or ensure continued payment of loans made by Mezzanine Finance LLC

1

("MFL"), a separate finance company in which both Sykes and Sundry had a substantial ownership interest. Wheatland's losses arise from Sykes' and Sundry's conflicts of interest and intentional wrongdoing to benefit their own personal financial interests at the direct expense of, and with the intent to cause a loss to, the Bank.

## PARTIES, JURISDICTION AND VENUE

3. Plaintiff FDIC is a corporation organized and existing under the laws of the United States of America. 12 U.S.C. §1811, *et seq*. The FDIC is an instrumentality of the United States of America and is charged with, among other duties, the orderly liquidation of failed banks. 12 U.S.C. §1821(d). Wheatland was a state-chartered, nonmember bank headquartered in Naperville, Illinois. On April 23, 2010, the Illinois Department of Financial and Professional Regulation closed Wheatland and appointed the FDIC as Receiver. Pursuant to 12 U.S.C. §1821(d)(2), the FDIC-Receiver succeeded to all rights, titles and privileges of Wheatland and its shareholders, including the Bank's claims under a Financial Institution Bond issued by OneBeacon.

4. Defendant OneBeacon is a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business in Massachusetts.

5. This Court has subject matter jurisdiction pursuant to 12 U.S.C. §1819(a) and (b)(2)(A) and 28 U.S.C. §1331 and §1345.

6. This Court has personal jurisdiction over OneBeacon. OneBeacon sold insurance in Illinois and specifically contracted with Wheatland to insure risks located in Illinois.

7. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because the claims asserted herein arise from actions that took place within this judicial district.

**RELEVANT TERMS OF BOND**

8. OneBeacon issued Financial Institution Bond No. 474000406-000 ("Bond") to Wheatland. The Bond was effective from December 14, 2007 to December 14, 2010 ("Bond Period").

9. Wheatland was the named insured under the Bond. Pursuant to Endorsement No. 2 to the Bond, the maximum coverage for a single loss under the Bond is $3 million with a $25,000 deductible. The Bond also provides $100,000 in additional coverage for reasonable claim preparation expenses.

10. The Bond obligates OneBeacon to indemnify Wheatland for financial losses "resulting directly from dishonest or fraudulent acts committed by an Employee . . . with the intent: (a) to cause [Wheatland] to sustain such loss; or (b) to obtain financial benefit for the Employee or another person or entity." *See* Exh. A., Bond at p. 2, I.(A) Employee Dishonesty.

11. The Bond defines "Employee" to include any person who was a director, officer or employee of Wheatland. *Id.* at p. 14, III.(30).

12. The Bond provides coverage for losses discovered during the Bond Period "regardless of when the act or acts causing or contributing to such loss occurred." *Id.* at p. 23, V.(D).

**FACTUAL BACKGROUND**

13. Sykes was President and Chief Executive Officer of Wheatland from February 2007 until his termination on June 15, 2009. Sykes also was a member of the Board of Directors and the Loan Committee. Sundry was a member of the Board of Directors and the Loan Committee from February 2007 until July 1, 2009.

14. MFL was a finance company owned by Sykes, Sundry and another individual, Edward Elsbury ("Elsbury"). MFL made mezzanine loans to commercial customers for real estate projects. MFL made loans to a number of entities that also were borrowers of Wheatland.

15. Sykes and Sundry committed dishonest and fraudulent acts with respect to two different loans that caused a direct financial loss to Wheatland. Sykes and Sundry misused their respective positions at Wheatland in collusion with, and in order to provide financial benefit to, their company MFL.

### A. Village Walk Loan

16. Employing dishonest and fraudulent means, Sykes and Sundry induced Wheatland to make a $5.4 million loan to Village Walk, LLC ("Village Walk") on December 31, 2007 ("Village Walk Loan").

17. Village Walk is a limited liability company wholly owned by GV Designer Homes, Ltd., which in turn is wholly owned by George Venturella ("Venturella").

18. The purpose of the Village Walk Loan was to pay off two outstanding loans previously made to Village Walk by Mutual Bank ("Mutual") and MFL.

19. On July 24, 2006, Mutual made a $7.75 million loan to Village Walk ("Mutual Loan"). This loan was secured by a first mortgage on two parcels of property—a nine acre tract planned for commercial use ("9 Acre Tract") and a 40 acre tract intended for residential development ("#011 Tract").

20. In November 2006, MFL made a $940,000 loan to Village Walk with an interest rate of 20 percent and a maturity date of December 1, 2007 ("MFL Loan"). The MFL Loan was secured by a second mortgage on both the 9 Acre Tract and the #011 Tract.

21. On April 19, 2007, Village Walk sold the #011 Tract, which was partial collateral for both the Mutual Loan and the MFL Loan, to Creekside of Frankfort, LLC ("Creekside"). Village Walk used some of the proceeds from this sale to reduce the outstanding balance on the Mutual Loan to approximately $3.7 million. The warranty deed transferring ownership of the #011 Tract from Village Walk to Creekside was recorded on June 1, 2007.

22. In April 2007, Sykes was advised of the sale of the #011 Tract. Just prior to the closing of the #011 Tract sale, Elsbury specifically requested information from Venturella on the details of the sale to provide a lien release and update MFL's loan to value ("LTV") ratio for its loan to Village Walk. Sykes was copied on that email correspondence. On information and belief, Sundry, as a principal of MFL, also was aware of Village Walk's sale of this property.

23. In November 2007, Sykes and Sundry were anticipating timely repayment of the MFL Loan from the sale of a parcel in the 9 Acre Tract. MFL needed Village Walk to repay its loan so MFL could satisfy its own financial obligations to MFL's lender, M&I Marshall & Isley Bank ("M&I").

24. On November 28, 2007, Venturella informed MFL the closing of the sale of a parcel from the 9 Acre Tract was delayed and the MFL Loan could not be repaid until that sale closed. Sykes and Sundry became concerned the sale would not go through and MFL would not be repaid by Village Walk. On December 3, 2007, Sykes proposed to Venturella that Wheatland could fund the pay off of the existing loans to Village Walk.

25. To ensure that MFL would be fully and promptly repaid by Village Walk and they would personally profit, Sykes and Sundry caused Wheatland to make a loan to Village Walk based on false pretenses with the intent to cause loss to the Bank.

26. Despite his personal financial interest in having Wheatland take out the MFL Loan, Sykes was involved in the preparation of a Loan Approval Request ("Loan Request") for the Village Walk Loan. On or about December 7, 2007, Sykes submitted the Loan Request to the Bank's Loan Committee. The Loan Request contained the following misrepresentations:

  a. falsely identified the #011 Acre Tract as collateral for the Village Walk Loan even though Sykes and Sundry knew Village Walk had already sold the property in April 2007 and it could not be collateral for the Village Walk Loan.

  b. falsely included the #011 Acre Tract and its outdated appraised value of $2.2 million in calculating an LTV ratio of 60 percent even though Sykes and Sundry knew the #011 Tract could not be used to secure the Village Walk Loan. Sykes dishonestly included the #011 Acre Tract for the purpose of reducing the LTV ratio on the Village Walk Loan.

  c. falsely stated the MFL Loan was current. In fact, Village Walk was in default on the MFL Loan at the time and MFL assessed a 5 percent late fee and increased the interest rate to 25 percent due to Village Walk's breach of the MFL Loan agreement.

27. Sykes and Sundry were members of the Loan Committee at the time the Village Walk Loan was presented. Despite their personal financial interest in Wheatland approving the Village Walk Loan, Sykes presented the proposed loan to the Loan Committee and both Sykes and Sundry voted in favor of the Village Walk Loan.

28. Sykes and Sundry violated Wheatland's conflict of interest policy by personally participating in the underwriting and/or approval of the Village Walk Loan, in which they had a

6

direct financial interest. Neither Sykes nor Sundry properly disclosed to Wheatland how they would personally benefit from the Village Walk Loan. Nor did Sykes and Sundry properly disclose to Wheatland their concern about whether Village Walk would repay the MFL Loan.

29. On December 12, 2007, the Loan Committee approved the Village Walk Loan subject to certain closing requirements, including: (i) a satisfactory appraisal report indicating an LTV ratio of 75 percent or less; (ii) a satisfactory appraisal review; and (iii) establishment of an interest reserve of $400,000 in a Wheatland account.

30. None of these closing requirements were satisfied. Sykes caused the Village Walk Loan to close even though he knew all of the closing conditions had not been met.

31. Sykes never obtained a satisfactory appraisal report indicating an LTV ratio of 75 percent or less. Sykes also failed to obtain a satisfactory appraisal review of the stated collateral on the Village Walk Loan. In fact, Sykes specifically restricted the appraisal review to the 9 Acre Tract and did not obtain an appraisal review of the #011 Tract, which he knew had already been sold.

32. Sykes also did not establish the required interest reserve at closing. Instead, Wheatland disbursed $576,669.54 to the borrower in unrestricted funds from the loan proceeds.

33. In closing the Village Walk Loan, Sykes employed dishonest acts to conceal the misrepresentations regarding the collateral for the loan. On information and belief, Sykes directed Wheatland personnel to order a title insurance policy only on the 9 Acre Tract. Wheatland's established loan procedure and general safe and sound lending practices required obtaining a title insurance policy on the entire security for the loan. By directing that the title policy and search only cover the 9 Acre Tract, Sykes was able to hide Village Walk's inability to provide the #011 Tract as collateral for the loan.

34. Contrary to Sykes' representation to the Loan Committee that the #011 Tract would be collateral for the loan, Wheatland obtained only a security interest in the 9 Acre Tract. The mortgage contains no reference to the #011 Tract.

35. On December 31, 2007, Wheatland closed the $5.4 million loan to Village Walk. From the loan proceeds, Wheatland disbursed $1,112,546.21 directly to MFL. Upon receipt of those funds, MFL repaid $940,000 to its lender M&I.

36. Wheatland would not have made the Village Walk Loan had Sykes and Sundry properly disclosed to the Loan Committee all of the relevant factors, including, but not limited to, the following: (a) the #011 Tract had been sold and could not be collateral for the Village Walk Loan; (b) the actual LTV ratio was in excess of 75 percent; (c) Village Walk was not current on the MFL Loan; (d) the $400,000 interest reserve would not be established and $576,669.54 of the loan proceeds would be disbursed directly to Village Walk; (e) Sykes and Sundry were concerned about whether Village Walk could repay the MFL Loan; and (f) Sykes and Sundry would personally benefit from this loan.

37. Sykes and Sundry directly profited from the Village Walk Loan. MFL received full repayment of its loan to Village Walk and MFL earned a profit on the MFL Loan of over $100,000, including the payment of all late fees and interest penalties. MFL also distributed certain of its profits from the Village Walk transaction directly to Sykes and Sundry.

38. Wheatland lost $4,188,598 on the Village Walk Loan.

**B.     Bellony Loan**

39. Sykes misused his position at Wheatland and employed fraudulent and dishonest acts to cause Wheatland to make a loan to Bellony Real Estate and Development, LLC ("Bellony") to further Sundry's and his own financial interests in MFL.

40. In February 2007, Bellony, a real estate development company owned by Anthony and Stephanie Pendolino, contacted Sykes in his capacity as President of Wheatland. Bellony was seeking to obtain financing for the purchase of two residential lots in Naperville, Illinois ("Naperville Property").

41. Even though Sykes was contacted in his capacity as an officer of Wheatland, Sykes arranged for two loans to Bellony: one from Wheatland ("Bellony Loan") and the other from MFL ("Mezzanine Loan").

42. In March 2007, Sykes underwrote and approved a $693,750 loan from Wheatland to Bellony secured by a first mortgage on the Naperville Property. The Bellony Loan had a floating interest rate with a floor of 7.25 percent. Sykes used his authority to approve loans under $1 million and did not submit the Bellony Loan to the Loan Committee for approval.

43. At the same time, Sykes caused MFL to make a $92,500 loan to Bellony secured by a second mortgage on the Naperville Property. The interest rate on the Mezzanine Loan was 20 percent. MFL would not have been able to make the Mezzanine Loan without Sykes' approval of Wheatland's first mortgage loan of $693,750.

44. Sykes prepared an internal loan write-up to justify his approval of the Bellony Loan. The loan write-up was materially misleading because it failed to disclose MFL's second mortgage on the Naperville Property or Sykes' personal interest in having Wheatland make the loan. The loan write-up also failed to address the impact of the Mezzanine Loan with its 20 percent interest rate on Bellony's ability to repay Wheatland and the increased LTV ratio. Furthermore, Sykes concealed his personal interest in the loan by misrepresenting the referral source of the loan.

45. Sykes' failure to consider the impact of the higher interest rate of the Mezzanine Loan on Bellony's ability to repay Wheatland demonstrates that Sykes placed his own personal financial interest in MFL above Wheatland's interests and acted with the intent to cause loss to the Bank.

46. Sykes violated Wheatland's conflict of interest policy by personally approving the Bellony Loan.

47. In the course of administering this loan, Sykes continued to favor MFL's financial interests over Wheatland's interests with the intent to cause loss to the Bank. When Bellony requested interest rate relief on both loans because it was unable to make the required monthly payments, Sykes refused to reduce the 20 percent interest rate on the Mezzanine Loan. However, Sykes twice reduced the interest rate on the Bellony Loan, from a floor of 7.25 percent to a floor of 5.5 percent. Sykes also agreed to extend the maturity date of the Bellony Loan. Thus, despite its second lien position, MFL continued to receive its full monthly payment at the same time Sykes agreed to reduce Bellony's monthly payments to Wheatland. When the borrower stopped making any payments on both loans, Sykes caused MFL to declare a default on its second mortgage loan, but took no steps on behalf of Wheatland to protect its interests.

48. Sykes' actions to ensure continued payments to MFL to the financial detriment of Wheatland constitute dishonest and fraudulent acts.

49. Wheatland would not have made the Bellony Loan or administered the loan in this manner, but for Sykes' dishonest and fraudulent acts.

50. Through his ownership interest in MFL, Sykes personally profited from his dishonest and fraudulent acts in inducing Wheatland to make the Bellony Loan and administering the loan in a manner designed to favor MFL at the expense of Wheatland. MFL

received full interest payments at 20 percent per annum for approximately two years, even though Sykes was aware the borrower lacked the funds to service the entire debt on the Naperville Property. MFL received over $25,000 in interest payments on its loan of only $92,500 over this two year period.

51. Wheatland lost $301,917 on the Bellony Loan.

### C. OneBeacon Was Provided With Timely Notice And A Proof Of Loss

52. On or after June 13, 2009, Wheatland first became aware of facts demonstrating that Sykes and Sundry had committed fraudulent and dishonest acts with the intent to cause a loss to the Bank.

53. On June 23, 2009, Wheatland gave notice of loss to OneBeacon, which was within the applicable time period provided for in the Bond.

54. On December 21, 2009, OneBeacon granted Wheatland a six-month extension to file its proof of loss. On April 8, 2010, the Bank timely submitted a proof of loss to OneBeacon and, on May 11, 2010, an amended proof of loss was timely submitted to OneBeacon.

55. At OneBeacon's request, the FDIC-Receiver provided additional documents regarding these covered losses. Despite repeated demands, OneBeacon has failed to pay the covered losses caused by the dishonest and fraudulent acts of Sykes and Sundry.

### COUNT I – BREACH OF CONTRACT

56. FDIC-Receiver incorporates and realleges paragraphs 1 through 55 above as if fully set forth herein.

57. The Bond is a valid and enforceable contract between Wheatland and OneBeacon supported by good and valuable consideration.

58. Wheatland has satisfied all of its obligations under the Bond, including making all premium payments.

11

59. OneBeacon agreed to indemnify Wheatland for covered losses under the Bond.

60. The losses suffered by Wheatland as a direct result of the dishonest and fraudulent acts by Sykes and Sundry described herein are covered losses under Clause I(A) of the Bond.

61. Wheatland discovered the acts of Sykes and Sundry and the resultant losses during the effective period of the Bond.

62. Wheatland gave timely and proper notice of loss to OneBeacon under the Bond.

63. Wheatland submitted a timely and proper proof of loss to OneBeacon under the Bond.

64. OneBeacon has breached its contractual obligation under the Bond by failing to indemnify the FDIC-Receiver for the covered losses caused by the dishonest and fraudulent acts of Sykes and Sundry.

65. Under the terms of the Bond and by operation of law, the FDIC-Receiver is entitled to bring this breach of contract action to recover damages. *See* 12 USC §1821(d).

66. Wheatland and the FDIC-Receiver have incurred more than $100,000 in reasonable claim preparation expenses.

67. As a proximate and direct result of OneBeacon's breach of its indemnity obligation under the Bond, the FDIC-Receiver has been damaged in the full amount of the Bond plus its expenses in preparing the claim, prejudgment interest, and attorney's fees and costs.

## **JURY DEMAND**

The FDIC-Receiver requests a trial by jury on all claims so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff FDIC as Receiver for Wheatland Bank prays for:

(a) judgment be entered in its favor and against OneBeacon for all damages sustained as a result of OneBeacon's breach of contract;

(b) judgment in its favor and against OneBeacon for claim preparation expenses, prejudgment interest, and attorney's fees and costs; and

(c) for such other and further relief as the Court deems just and proper.

Dated: June 10, 2011                    Respectfully submitted,

/s/ Antony S. Burt
Antony S. Burt
Lawrence H. Heftman
Willoughby Anderson

SCHIFF HARDIN LLP
233 South Wacker Drive
Suite 6600
Chicago, IL 60606
Tel: (312) 258-5500
Fax: (312) 258-5600

*Attorneys for the Federal Deposit Insurance Corporation, as Receiver for Wheatland Bank*