**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for WHEATLAND BANK, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     No. 11 C 3972 |
| | ) |
| ONEBEACON MIDWEST INSURANCE COMPANY, | ) ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Before the court is defendant OneBeacon Midwest Insurance Company's ("OneBeacon") motion for summary judgment. For the reasons explained below, we deny OneBeacon's motion.

## BACKGROUND

The Federal Deposit Insurance Corporation, as receiver for Wheatland Bank ("FDIC-R"), claims that OneBeacon breached its obligation to insure Wheatland for losses stemming from dishonest conduct by two former executives, Michael Sykes and Art Sundry. Sykes and others organized Wheatland, which began operations in February 2007. (Def.'s Stmt. ¶5.) During 2007, Sykes held several positions within the bank: President, CEO, director, and Loan Committee member. (Id. at ¶ 6.) Sundry was a director, shareholder, and Loan Committee member. (Id. at ¶ 7.) Sykes and Sundry were also two of the three owners (along with Ed Elsbury) of

Mezzanine Finance LLC ("MFL"). (<u>Id.</u> at ¶ 13; <u>see also</u> Pl.'s Resp. to Def.'s Stmt. ¶ 13.)  MFL made short-term, high-interest-rate second-lien loans secured by real property. (Def.'s Stmt. ¶ 13.)

### 1.    The Pendolino Loan

On March 8, 2007, Sykes and Wheatland's CFO, Dolores Ritter, approved a $693,750 loan to Bellony Real Estate and Development, LLC (the "Pendolino Loan"). (<u>See</u> <u>id.</u> at ¶ 18; <u>see also</u> Pl.'s Resp. to Def.'s Stmt. ¶ 18.)  The loan was secured by a first mortgage, and by guarantees from Anthony Pendolino and Stephanie Lacey-Pendolino. (<u>See</u> Def.'s Stmt. ¶ 18; <u>see also</u> Pl.'s Resp. to Def.'s Stmt. ¶ 18.)  The Pendolino Loan closed on March 16, 2007. (<u>Id.</u> at ¶ 19.)  MFL made a second-lien loan to the Pendolinos that closed the same day. (<u>Id.</u>)  The MFL loan had a 20% interest rate and was secured by a junior lien subordinate to Wheatland's mortgage on the same collateral. (<u>Id.</u>)  On the day before closing, Sykes disclosed the existence of the MFL loan to Len Eichas — who was Wheatland's Vice President and Chief Lending Officer, a member of the bank's Loan Committee, and a director. (<u>See</u> Def.'s Stmt. ¶¶ 20-21; Pl.'s Resp. to Def.'s Stmt. ¶ 20.)  On March 21, 2007, the Loan Committee — including Eichas — considered and approved the Pendolino Loan *ex post facto*. (<u>See</u> Def.'s Stmt. ¶ 22.)[1]  OneBeacon argues that

---

[1]    The *ex post facto* approval procedure was consistent with the bank's Loan Policy. (<u>See</u> Def. Reply to Pl.'s Resp. ¶ 22.)

Wheatland's Loan Policy required Sykes and Sundry to recuse themselves from considering the Pendolino Loan:

> Under no circumstances shall a loan officer make, fund or vote on a loan to a family relative, to another officer, or any other person or business which could be considered a conflict of interest.

(Loan Policy, attached as Ex. 8 to Def.'s Resp. to Pl.'s Stmt., at 5.) The Loan Policy itself does not define "conflict of interest." But the bank's Code of Ethical Conduct Policy is instructive:

> A "conflict of interest" exists or may exist whenever a Covered Person's private interests are adverse to, interfere with, or influence the objective judgment and action of the Covered Person (or appear to do any of the foregoing) with respect to the business interests of the Company. Conflicts of interest may also arise when a Covered Person or an affiliate (including a family member) of such Covered Person receives improper personal benefits from any Company action or omission to act which are substantially attributable to such Covered Person's position with the Company.
>
> [. . .]
>
> Conflicts of interest are prohibited as a matter of Company policy.

(Code of Ethical Conduct Policy, attached as Ex. 12 to Def.'s Resp. to Pl.'s Stmt., at 3.) The FDIC-R contends that it is "uncertain" whether Sykes had to recuse himself with respect to the Pendolino Loan because: (1) he approved the Pendolino Loan *before* he approved the MFL loan; (2) the MFL loan was junior to the Pendolino Loan; and (3) neither Sykes nor Sundry had an interest in the underlying project and they did not receive any proceeds of the Pendolino Loan. (<u>See</u> Def.'s Resp. to Pl.'s Stmt. ¶ 24.)

## 2. The Village Walk Loan

In November 2006, MFL made a $940,000 loan to Village Walk, LLC that was subordinate to a first-lien loan from Mutual Bank. (Def.'s Stmt. ¶ 28; Pl.'s Stmt. of Add'l Facts ¶ 5.) A local real estate developer, George Venturella, owned Village Walk. (See Pl.'s Stmt. of Add'l Facts ¶ 5.) MFL's loan had a one-year term, maturing on December 4, 2007, and was secured by a mortgage on two parcels of land designated for residential use and commercial development, respectively. (Id. at ¶¶ 5-6.) Venturella made late payments to MFL during the loan's term, and Elsbury personally went to Venturella's office on several occasions to collect money. (Id. at ¶ 8.) During this time, MFL was in workout negotiations with Anthem Home Builders ("Anthem") on two non-performing loans. (Id. at ¶ 9.) Anthem's failure to repay MFL on time caused Sykes and Sundry to make additional capital contributions to MFL to cover its financing costs. (Id.) And they needed Venturella to repay his loan at maturity to avoid having to make further capital contributions. (Id. at ¶ 10.) Sykes "repeatedly pressed" Venturella to confirm the he would repay the loan on time. (Id. at ¶ 10.)[2] And until shortly before the maturity date, Venturella did not indicate to Sykes or Sundry that he would be unable to do so. (Id. at ¶ 11.) On November 28, 2007, Venturella emailed Sykes and

---

[2] OneBeacon disputes whether MFL was in "financial distress," but it has not cited any portion of the record supporting its contention. (See Def.'s Reply to Pl.'s Resp. ¶ 10.)

Sundry that he could not repay MFL on time because the sale of the Village Walk property had been delayed. (<u>Id.</u> at ¶ 11.) Sykes told Venturella that "[t]his debt must be repaid on December 4, 2007 or we will be very unhappy with you and our arrangement." (<u>Id.</u> at ¶ 14.)  Internal emails amongst MFL's principals convey just how "unhappy" they were.  Sykes told his partners that he was "very insecure" about the property's potential purchaser and that he felt "very much betrayed at [Venturella's] late disclosure." (<u>Id.</u> at ¶ 12.)  Sundry reacted similarly:

> no relief!
>
> he knew and has avoided us and made no contingency plans and told us on 11/29
>
> i want the **5% late fee** and 100% of interest IMMEDIATELY to grant a 90 day extension.  during extension, he pays full 20% MONTHLY, IN ADVANCE!
>
> he is not a straight shooter

(Email from Sundry to Elsbury & Sykes, dated Nov. 29, 2007, attached as Ex. 28 to Pl.'s Resp. to Def.'s Stmt. (emphasis in original).)  On December 3, 2007 — the day before the maturity date — Sundry pressed Venturella to obtain a loan from Mutual Bank to pay off MFL's loan, but told his colleagues that he did not believe that Venturella would do so. (<u>Id.</u> at ¶ 15.)  On December 5, 2007, MFL issued a default letter imposing a $47,000 late fee and a 25% default interest rate going forward. (<u>Id.</u> at ¶ 16.)[3]  Without a

---

[3] OneBeacon says that MFL later issued a "corrected" letter, but it does not cite any portion of the record to support that assertion. (<u>See</u> Def.'s Reply to Pl.'s Resp. ¶ 16.)

reliable source of repayment, MFL's partners were at risk of carrying both the failed Anthem loans and the Village Walk loan for an unknown period of time. (Id. at ¶ 17.)

It is not entirely clear from the raw record, but the parties appear to agree that Venturella first proposed the idea of obtaining a loan from Wheatland. (See Def.'s Stmt. ¶ 30; see also Pl.'s Resp. to Def.'s Stmt. ¶ 30.) Sykes prepared a Loan Approval Request for a transaction refinancing Mutual's senior loan and MFL's junior loan. (See Def.'s Stmt. ¶ 31.)[4] He testified in this case that he believed, at that time, that it was "a very nice loan for [Wheatland] . . . ." (See Def.'s Stmt. ¶ 31; Pl.'s Resp. to Def.'s Stmt. ¶ 31.) The Loan Approval Request lists "conditions precedent to closing," including: (1) a "[s]atisfactory Appraisal Report indicating loan to value of 75% or less;" (2) a "[s]atisfactory appraisal review;" and (3) an "[i]nterest reserve of $400,000 ($5,400,000 @ 7.50% x 12 months) to be established in a Wheatland Bank account." (See Loan Approval Request, attached as Depo. Ex. 21 to Def.'s Stmt., at 2.) It also states that Village Walk was "current" on its payments to MFL and Mutual Bank. (Pl.'s Stmt. of Add'l Facts ¶ 18.) It did not disclose that the MFL loan was past its maturity date, that MFL had issued a default letter

---

[4] The FDIC-R quibbles with OneBeacon's statement that Sykes "prepared" the Loan Approval Request. (See Pl.'s Resp. ¶ 31 (stating that Sykes had "some involvement" in creating the document).) They cite Sykes's testimony that he assigned the task to a junior credit analyst fresh out of college. (See Sykes Dep. at 213.) But Sykes drafted the "Borrower Background" section, and he admits that he was responsible for the report's accuracy. (Id.)

imposing a late fee and default interest, or that Sykes and Sundry had misgivings about Venturella's trustworthiness. (Id.) Frank Maly and Louis Spangler, who were members of Wheatland's Loan Committee at that time, testified that they would not have approved the Village Walk Loan if Sykes and/or Sundry had disclosed this information. (See id. at ¶ 19; Maly Dep., attached as Ex. 18 to Pl.'s Resp. to Def.'s Stmt., 300; Spangler Dep., attached as Ex. 19 to Pl.'s Resp. to Def.'s Stmt., 347-62.) Sykes contends that he did disclose this information to the Loan Committee, and that he also told the Committee that he would be relying on a two-year old appraisal with respect to the tract of the Village Walk property designated for residential use. (See Pl.'s Stmt. of Add'l Facts ¶ 22; see also Loan Approval Request at 2 (citing a January 24, 2006 appraisal of that tract).) The minutes of the Loan Committee meeting do not mention these alleged disclosures. But they do state that Sykes disclosed that he and Sundry were principals of MFL:

> Michael Sykes disclosed that Mezzanine Finance, in which he and Arthur Sundry, Jr. are principals, currently has a secondary financing on the subject property.

(Minutes of 12/12/07 Loan Committee Meeting, attached as Depo. Ex. 268 to Def.'s Stmt., at 1.) Eichas, Sundry, and Maly testified that they could not independently recall the meeting, but they also said that they had no reason to doubt that the minutes are accurate. (See Eichas Dep, attached as Ex. 13 to Pl.'s Resp. to

Def.'s Stmt., at 119; Sundry Dep., attached as Ex. 20 to Pl.'s Resp. to Def.'s Stmt., at 181-84; Maly Dep. at 131-33; <u>but see</u> Maly Dep. at 142 (testifying that he did not connect Sykes and Sundry with MFL until Spangler called him after the Loan Committee meeting and asked him, "do you know you gave Art Sundry and Mike Sykes a million dollars?").) Spangler also testified that he does not remember what the Committee discussed, but nevertheless insists that he "was never told that MFL LLC, owned by Mike Sykes, Art Sundry, and Ed Elsbury, were receiving any kind of proceeds from this transaction." (Spangler Dep. at 182-83.)

Sykes remained responsible as the loan officer for ensuring that Wheatland's closing conditions were satisfied. (Pl.'s Stmt. of Add'l Facts ¶ 23.) But Sykes did not order a current appraisal or "appraisal review" for the tract designated for residential use. (<u>Id.</u>) The FDIC-R also contends that the residential tract was not secured as collateral for the Village Walk Loan, pointing out that the Mortgage executed on the closing date did not include a "Legal Description" or PIN number for that tract. (<u>Id.</u> at ¶ 24.)[5] OneBeacon argues that the omission was later corrected, but it has not cited any record evidence to support that assertion. (<u>See</u> Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ¶ 24.) It also disputes whether Sykes actually knew about the omission. (<u>See</u> Def.'s Resp.

---

[5] We are relying on the parties' apparent agreement that the two tracts of land described in the Mortgage do not cover the residential tract, (<u>see</u> Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ¶ 24), because it is not obvious to us from the face of that document.

to Pl.'s Stmt. of Add'l Facts ¶ 24.) It is undisputed, however,
that the parties did not create the $400,000 interest reserve that
the Loan Approval Request required: Village Walk received $575,000
in cash, without any reserve. (Cf. Loan Approval Request at 3
(indicating that 100% of the loan proceeds would be distributed
among Mutual Bank, MFL, and the interest reserve, without any
payment to Village Walk).)[6] MFL received $1,112,546.21 at the
December 31, 2007 closing, which included payment for the late fee
and default interest that MFL had imposed when Village Walk did not
repay the loan on the maturity date. (See Pl.'s Stmt. of Add'l
Facts ¶ 26.) Sundry testified that he, Sykes, and Elsbury each
withdrew $9,000 from MFL's account after the closing to repay
themselves for their recent capital contributions. (See Pl.'s Stmt.
of Add'l Facts ¶ 26; see also Email String Between Sykes, Elsbury,
and Sundry, dated Jan. 3, 2008, attached as Ex. 46 to Pl.'s Stmt.
of Add'l Facts (Elsbury: "Also, propose we pay ourselves back on at
least a portion of the capital that we have contributed. At the
very least the $8,000 we all just recently put in."; Sykes: "I have
no problem with each of us pulling the $8,000 (or was it $9,000),
we just put in."); Sundry Dep. at 196 (testifying that MFL's

---

[6] OneBeacon has not cited any record evidence supporting its argument
that this was simply an oversight. (See Def.'s Resp. to Pl.'s Stmt. of Add'l
Facts ¶ 25.)

principals paid themselves $9,000 each as contemplated in the just-cited emails).)[7]

### 3. Wheatland's Insurance Coverage

Wheatland's charter and "order of deposit insurance" required the bank to maintain a financial institution bond. (Pl.'s Stmt. of Add'l Facts ¶ 31.) In February 2007, Ritter, the bank's CFO, prepared and signed an application for a financial-institution bond from OneBeacon. (<u>Id.</u> at ¶ 33.) Sykes also signed the application. (<u>Id.</u>) OneBeacon issued a Financial Institution Bond (the "Bond") retroactively effective as of December 14, 2006, and expiring December 14, 2007. (<u>Id.</u>; <u>see also</u> Letter from C. Beimert to T. Feller, attached as Ex. 54 to Pl.'s Stmt. of Add'l Facts (enclosing the policy).) On November 7, 2007, Ritter completed and signed an application to renew the bond. (Pl.'s Stmt. of Add'l Facts ¶ 34.) Sykes signed the application (containing Ritter's answers) on the same date. (<u>Id.</u>)[8] On Wheatland's behalf, Sykes and Ritter answered "no" to the following questions:

---

[7] OneBeacon argues that the evidence does not support the fact that Sykes and Sundry received Wheatland funds "directly or personally." (<u>See</u> Def.'s Reply to Def.'s Resp. ¶ 26.) The proceeds of the Village Walk Loan were disbursed to MFL, (<u>see</u> Escrow Trust Disbursement Statement, dated Dec. 31, 2007, attached as Ex. 17 to Pl.'s Stmt. of Add'l Facts, at 1), possibly to an account containing commingled funds. But a jury could reasonably conclude that MFL's principals withdrew money from MFL because Village Walk had just repaid its loan (including the late fee and default interest) with funds from Wheatland.

[8] OneBeacon insists that, as Wheatland's CEO and President, Sykes was required to sign the application. (<u>See</u> Def.'s Stmt. ¶ 54.) But the application could also have been signed by Spangler as Chairman of the Board. (<u>See</u> App. for Financial Institution ("Bond Application"), dated Nov. 7, 2007, attached as Ex. 33 to Pl.'s Resp. to Def.'s Stmt., at 7.)

64.  Does any director/trustee or officer have any
knowledge of any fact, circumstance or situation
involving the Financial Institution, its subsidiaries, or
any past or present director/trustee, officer or
employee, which could reasonably be expected to give rise
to a future liability or bond loss?

65.  Are there any claims or potential claims that have
not been reported to the insurer involving the Financial
Institution, any subsidiary, or any Insured Person
resulting from their activities as such?

(Bond App., attached as Depo. Ex. 88 to Def.'s Stmt., at 5.)  By

executing the application, Ritter and Sykes represented that "to

the best of their knowledge and belief, after reasonable inquiry,"

their answers were "true and complete."  (See id. at 7

("Representation Statement"); see also Def.'s Stmt. ¶ 58.)  The

application required them to "immediately notify" OneBeacon of any

"material change" to their answers before the "policy inception

date."  (Bond App. at 7 ("Representation Statement"); see also

Def.'s Stmt. ¶ 58.)  OneBeacon approved the application on December

5, 2007, and it became effective on December 14, 2007.  (See

Financial Institution Bond, Bond No. 474000406-0000, attached as

Depo. Ex. 70, at OB 00013.)  Sykes did not update his answers to

questions 64 and 65 at any point before the Bond's effective date.

(See Pl.'s Resp. to Def.'s Stmt. ¶ 59.)

The FDIC-R contends that Wheatland discovered Sykes's and

Sundry's "dishonest" acts in June 2009 during an investigation

prompted by Spangler's concerns about Sykes's lending practices.

(See Def.'s Stmt. of Add'l Facts ¶ 27.)  OneBeacon disputes that

this constitutes "discovery" as contemplated by the Bond, (<u>see</u>
Def.'s Reply to Pl.'s Resp. at 27), but apparently it is undisputed
that the investigation set in motion Wheatland's eventual claim for
coverage.  On June 23, 2009, Wheatland notified OneBeacon that it
had discovered that Sykes and Sundry had committed fraud, and it
commissioned Plante Moran to conduct a more complete investigation.
(Pl.'s Stmt. of Add'l Facts ¶ 28.)  Wheatland filed a Proof of Loss
on April 8, 2010 describing the state of its investigation at that
time.  (<u>Id.</u> at ¶ 29.)  It asserted claims for both the Pendolino
and Village Walk Loans.  (Def.'s Stmt. ¶ 14; <u>see also</u> Proof of
Loss, dated April 8, 2010, attached as Ex. 4 to Pl.'s Resp. to
Def.'s Stmt., at 2-13.)  The Proof of Loss stated that Wheatland's
"investigation is continuing and the Insured reserves its right to
amend this proof of loss." (Pl.'s Stmt. of Add'l Facts ¶ 29.)

On April 23, 2010, the Illinois Department of Financial and
Professional Regulation closed Wheatland and appointed the FDIC as
receiver.  (Def.'s Stmt. ¶ 15.)  The FDIC-R continued to pursue
Wheatland's bond claim, (<u>see</u> Def.'s Stmt. ¶ 16), and later filed
this lawsuit for breach of contract based upon OneBeacon's failure
to indemnify the FDIC-R for the bank's alleged losses.  The FDIC-
R's original complaint, like Wheatland's Proof of Loss, asserted
claims for coverage based on both the Pendolino and Village Walk
Loans. (<u>See</u> Original Complaint, Dkt. 1, ¶¶ 16-51.)  It later
amended its complaint to drop its claim for coverage with respect

to the Pendolino Loan.[9]  The FDIC-R contends that it amended its complaint because it learned for the first time during discovery that Sykes told Eichas and the Loan Committee about MFL's loan to the Pendolino's.  (See Pl.'s Resp. to Def.'s Stmt. ¶ 26.) OneBeacon argues that the FDIC-R amended its complaint because it realized that it had made a tactical mistake: by alleging that an officer of the company was aware of the transaction in March 2007, the FDIC-R conceded that the Bond was terminated as to Sykes and Sundry at that time. (See infra.)

## DISCUSSION

OneBeacon has moved for summary judgment on the FDIC-R's claim for breach of contract on essentially three grounds.  First, it argues that the Bond terminated as to Sykes and Sundry when other Wheatland executives learned about MFL's loans to the Pendolinos and Village Walk.  (See Bond at OB 00038.)  Second, it argues that it is entitled to rescind the Bond because Sykes's statements in the Bond application were not truthful.  Third, it argues that the FDIC-R has not produced evidence that Sykes and Sundry colluded with Village Walk, which OneBeacon contends is a condition of coverage.  (See Bond at OB 00017.)  We will address each argument in turn.

## A.    Legal Standard

---

[9/]  The FDIC-R did not amend its Proof of Loss, but it is clear from the briefs that it is no longer seeking coverage for the Pendolino Loan.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party.  See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  "Summary judgment should be denied if the dispute is 'genuine':  'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question."  McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

## B.  The Bond's Termination Provision

The Bond contains a termination provision triggered by a "titled officer's" discovery that an employee has committed dishonest or fraudulent acts:

(c)  This Bond terminates as to any Employee . . .

> (i) as soon as any titled officer, branch manager, risk manager, or any director or trustee of the

> Insured not in collusion with such person, learns
> of any dishonest or fraudulent employment related
> act . . .
>
> . . . committed by such person at any time, whether in
> the employment of the Insured or otherwise, whether or
> not the type covered under Insuring Agreement (A),
> against the Insured or any other person or entity,
> without prejudice to the loss of any Property then in
> transit in the custody of such person.

(See Bond at OB 00038.) This type of provision is "well recognized

as being reasonable; to conclude otherwise would be contrary to

fundamental fairness and public policy — the [insured] should not

be compensated for losses caused by the misconduct of its employees

of which it was aware and did nothing to prevent." Kinzer on

Behalf of City of Chicago v. Fidelity and Deposit Co. of Maryland,

652 N.E.2d 20, 27 (Ill. App. Ct. 1995). An officer "learns" of a

fraudulent or dishonest act when he or she "gains sufficient

factual knowledge, not mere suspicion, which would justify a

careful and prudent man in charging another with dishonesty." Id.

at 28. Whether an officer has sufficient knowledge of a

colleague's dishonesty to trigger the termination clause is

question of fact. Id. at 29 ("Whether or not the employer prior to

the defalcation upon which an action is based had obtained

knowledge of dishonest acts is a question of fact.") (quoting 11B

J. Appleman, Insurance Law and Practice § 6978, at 465-67 (1981)).

Sykes told Eichas about MFL's loan to the Pendolinos, and he

maintains that he told the Loan Committee, too. So, construing the

evidence in the light most favorable to the FDIC-R, the bank never

discovered any "*fraudulent* employment related act" with respect to the Pendolino Loan. Nevertheless, OneBeacon argues that Sykes's and Sundry's disclosed conduct was "dishonest" within the meaning of the Bond, thereby terminating coverage as to those executives months before the bank made the Village Walk Loan.

Neither party has cited Illinois authority defining "dishonesty" in this context. OneBeacon argues that it is unnecessary to define the word precisely because the FDIC-R admitted that Sykes and Sundry were dishonest in its original complaint and Proof of Loss. First, the FDIC-R's allegations in its original complaint are not judicial admissions. <u>188 LLC v. Trinity Industries, Inc.</u>, 300 F.3d 730, 736 (7th Cir. 2002) ("When a party has amended a pleading, allegations and statements in earlier pleadings are not considered judicial admissions."). Second, OneBeacon has not cited any case holding that an insured is necessarily bound by statements in its proof of loss. Wheatland expressly reserved the right to amend its claim, and even though the FDIC-R has not formally done so, it has clearly abandoned its claim for losses on the Pendolino Loan. Moreover, the FDIC-R's explanation for amending its claim is plausible. There is no evidence that it knew about Sykes's email to Eichas before filing suit. Given that disclosure, the FDIC-R reasonably argues — contrary to its original claim — that bank officers never discovered any "dishonest" conduct with respect to the Pendolino

Loan. OneBeacon disagrees, (see infra), but we see no basis to bar the FDIC-R from asserting its new argument.

OneBeacon relies primarily on Community Sav. Bank v. Federal Ins. Co., 960 F.Supp. 16, 20 (D. Conn. 1995) to support its argument that Sykes had committed a "dishonest" act and that his colleagues were aware of it before the bank suffered a loss on the Village Walk Loan. In Community Savings, the insured's president and CEO held interests in a company that obtained a $300,000 loan from the insured. Id. at 18. The CEO failed to disclose his interest at the loan committee meeting approving the loan and failed to recuse himself from the vote. Id. He also falsely stated that the loan was a first-lien construction loan, when it was really a second mortgage. Id. At a special meeting of the board of directors two years after the loan closed, the board discovered the CEO's deception. Id. at 20. But it declined to act because the loans were "performing." Id. The Community Savings court concluded, as a matter of law, that the board's knowledge triggered the fidelity bond's termination clause. Id. ("[T]his Court concludes that the plaintiff learned, on August 22, 1990, of Festa's dishonest acts regarding the loans, thereby automatically terminating coverage under the Bond as to CSB's employee, Festa, from that point forward.").

Community Savings is distinguishable, particularly as applied to the Pendolino Loan. The CEO in that case *concealed* his interest

in the transaction and actively deceived the bank about the nature
of the loan. <u>See</u> <u>id.</u>; <u>see also</u> <u>Fidelity & Cas. Co. of N.Y. v.</u>
<u>Central Bank of Houston</u>, 672 S.W.2d 641 (Tx. Ct. App. 1984)
(evidence that the insured learned that its officer had <u>not</u>
disclosed his conflict of interest supported the jury's finding
that the bond was terminated before the claimed loss).
Nevertheless, it chose to turn a blind eye to the CEO's dishonesty.
<u>Community Savings</u>, 960 F.Supp. at 20. Sykes's email to Eichas
about the MFL loan states that the "mezzanine financing was
approved by us last night" – i.e., March 14, 2007 — after Sykes
approved the Pendolino Loan. So, as far as the record reveals,
Sykes did not have any personal interest to disclose when he
executed the Loan Approval Request form. His interest in the
transaction — through MFL — apparently arose later, and he
disclosed it to Eichas. Moreover, there is evidence that Sykes
also informed the entire Loan Committee at the meeting approving
the loan *ex post facto*. (<u>See</u> Sykes Dep. at 428 ("Q. When this loan
was eventually presented to the loan committee, did you have a
discussion with the loan committee about the Mezzanine Finance
loan? A. Yes.").) His testimony on this subject is admittedly
fuzzy. (<u>See</u> <u>id.</u> at 428-29 ("*Mr. Eichas would have* presented this
information to the loan committee sometime after Thursday, March
15th.") (emphasis added).) But his credibility is beyond the scope
of this opinion. <u>See</u> <u>Williams v. City of Chicago</u>, 733 F.3d 749,

752 (7th Cir. 2013) ("Neither we nor the district court can resolve issues of credibility when deciding a motion for summary judgment or an appeal from its grant.").

It is a closer call whether the MFL loan constituted a conflict of interest requiring Sykes and Sundry to recuse themselves. Wheatland's Loan Policy states that "[u]nder no circumstances shall a loan officer make, fund or vote on a loan to a family relative, to another officer, or any other person or business *which could be considered a conflict of interest in any way*." (See Loan Policy at FDIC 013417-18 (emphasis added).) Its Code of Ethical Conduct Policy states that "a 'conflict of interest' exists or may exist whenever a Covered Person's private interests are adverse to, interfere with, or influence the objective judgment and actions of the Covered Person (*or appear to do any of the foregoing*) with respect to the business interests of the Company." (Code of Ethical Conduct Policy at 3 (emphasis added).) Arguably, the fact that Sykes and Sundry deliberately entered into a transaction that made them a junior creditor of a Wheatland client "could be considered," or "appear[s]" to be, a conflict of interest. On the other hand, the FDIC-R points out that the MFL loan was junior to the Pendolino Loan, and "neither Sykes nor Sundry had an interest in the underlying project and received no proceeds from the Bank loan." (Pl.'s Resp. to Def.'s Stmt. ¶ 24.) Under the circumstances, we decline to rule as a

matter of law that MFL's loan to the Pendolinos was a conflict of interest. Even if we were convinced otherwise, OneBeacon would not be entitled to summary judgment. The bank did not learn in March 2007 that Sykes and/or Sundry had committed any overtly dishonest conduct. Cf. First Nat'l Bank of Sikeston v. Transamerica Ins. Co., 514 F.2d 981, 985 (8th Cir. 1975) (finding that the bank was aware of its executive's elaborate check-kiting scheme); Community Savings, 960 F.Supp. at 20 (finding that the bank learned that its CEO lied about the nature of the loan and concealed his interest in it). This is not the atypical case where the court can decide as a matter of law that the insured's knowledge triggered the termination provision. See Kinzer, 652 N.E.2d at 29 (it is a question of fact whether the insured is aware of dishonesty triggering the termination clause before suffering the claimed loss).

**2. The Village Walk Loan**

OneBeacon also argues that the bank learned, prior to closing the Village Walk Loan, that Sykes and Sundry had been "dishonest" with respect to that transaction. This loan was a clear conflict of interest — Sykes and Sundry benefitted financially from the transaction — and the FDIC-R concedes that they should have recused themselves. But the parties dispute whether the bank learned about the conflict before the loan closed. (See Pl.'s Stmt. of Add'l Facts ¶ 20.) The Loan Approval Request states that MFL would

receive proceeds from the loan, but it does not disclose Sykes's and Sundry's interests in MFL. Sykes testified that he did disclose his interest in MFL, and the minutes support his testimony. (See Minutes of 12/12/07 Loan Committee Meeting at 1 ("Michael Sykes disclosed that Mezzanine Finance, in which he and Arthur Sundry, Jr. are principals, currently has secondary financing on the subject property.").) He also testified that he disclosed the fact that Village Walk had not repaid MFL's loan on time. (See Pl.'s Stmt. of Add'l Facts ¶ 22.) Sundry, Maly, Spangler, Eichas, and Ryan Bormet — who purportedly drafted the minutes[10] — testified that they could not independently recall what the participants discussed at the meeting. (See Sundry Dep. at 181-82; Maly Dep. at 132-33; Spangler Dep. at 183; Eichas Dep. at 118-119; Bormet Dep., attached as Ex. 21 to Pl.'s Resp. to Def.'s Stmt., at 247-51.) We infer from Maly's testimony that he did not learn that Sykes and Sundry were principals of MFL until he received a phone call from Spangler shortly after the Loan Committee meeting explaining their affiliation. (See Maly Dep. at 143 (Paraphrasing Spangler: "do you know that you gave Art Sundry and Mike Sykes a million dollars?").) Spangler appears to deny that this conversation ever took place: "I was never told that Mezzanine Finance LLC, owned by Mike Sykes, Art Sundry, and Ed

---

[10]/ Bormet signed the minutes, but testified that he could not "recall this being my work specifically." (Bormet Dep. at 250.)

Elsbury, were receiving any kind of proceeds from this transaction." (Spangler Dep. at 183.)[11] There is a material factual dispute about whether Sykes fully disclosed his interests at the Loan Committee meeting. One possible conclusion from the disputed facts is that Sykes disclosed his conflict of interest, but concealed material information about the borrower that the bank did not discover until well after the loan had closed. Cf. Community Savings, 960 F.Supp. at 20. Again, we are not persuaded that a disclosed conflict of interest, standing alone, is sufficient to conclude as a matter of law that the Bond terminated prior to Wheatland's loss.

C.    **Wheatland's Bond Renewal Application**

In certain circumstances, an insurance company may rescind a policy because its insured made misrepresentations in the policy application:

> No misrepresentation or false warranty made by the insured or in his behalf in the negotiation for a policy of insurance, or breach of a condition of such policy shall defeat or avoid the policy or prevent its attaching unless such misrepresentation, false warranty or condition shall have been stated in the policy or endorsement or rider attached thereto, or in the written application therefor. No such misrepresentation or false warranty shall defeat or avoid the policy unless it shall have been made with actual intent to deceive or

---

[11]/  OneBeacon does not cite Eichas's testimony, which appears to be the clearest admission that a "titled officer" was aware that Sykes and Sundry stood to benefit from the Village Walk Loan. (See Eichas Dep. at 118-19 (stating that he knew before December 2007 that Sykes and Sundry were affiliated with MFL, and also knew from the Loan Approval Request that MFL would receive proceeds of the loan).) But again, Sykes insists that he disclosed that fact to the entire Loan Committee.

> materially affects either the acceptance of the risk or
> the hazard assumed by the company.

215 ILCS 5/154. OneBeacon argues that it is entitled to rescind the Bond because Sykes failed to disclose a "potential claim" arising from the Pendolino and Village Walk Loans. The FDIC-R responds that it is not bound by Sykes's statements in the application, and even if it were, there is a material factual dispute about whether Sykes had the necessary intent to deceive.

**1.   Whether Sykes Intended to Deceive OneBeacon**

Under the statute, an insurer cannot avoid coverage based upon an insured's misrepresentation unless the statement was "made with actual intent to deceive <u>or</u> materially affects either the acceptance of the risk or the hazard assumed by the company." <u>Id.</u> (emphasis added).  The Illinois Supreme Court has held, however, that the insurer must show an "actual intent to deceive" if the insured has made its representations on "knowledge and belief." <u>Golden Rule Ins. Co. v. Schwartz</u>, 786 N.E.2d 1010, 1016-17 (Ill. 2003) (a "knowledge or belief" clause has "the effect of shifting the focus, in a determination of the truth or falsity of an applicant's statement, from an inquiry into whether the facts asserted were true to whether, on the basis of what he knew, the applicant believed them to be true").  In this case, Ritter and Sykes represented that their answers on the application were true "to the best of their knowledge and belief, after reasonable

inquiry." (<u>See</u> Bond App. at 7 ("Representation Statement"); <u>see also</u> Def.'s Stmt. ¶ 58.) "[I]ntent to deceive" is ordinarily a fact question for the jury, but undisputed facts may so clearly contradict the applicant's purported intent that the court may decide the question as a matter of law:

> [T]he twin qualifiers [knowledge and belief] require[ ] that knowledge not defy belief * * *. * * * What the applicant in fact believed to be true is the determining factor in judging the truth or falsity of his answer, but only so far as that belief is not clearly contradicted by the factual knowledge on which it is based. In such event, a court may properly find a statement false as a matter of law, however sincerely it may be believed. To conclude otherwise would be to place insurance companies at the mercy of those capable of the most invincible self-deception — persons who having witnessed the Apollo landings, still believe the moon is made of cheese.

<u>Golden Rule</u>, 786 N.E.2d at 1017 (quoting <u>Skinner v. Aetna Life & Casualty</u>, 804 F.2d 148, 151 (D.C. Cir. 1986)) (emphasis omitted); <u>see also</u> <u>Conti v. Health Care Service Corp.</u>, 882 N.E.2d 614, 621 (Ill. App. Ct. 2007); <u>Pekin Ins. Co. v. Adams</u>, 796 N.E.2d 175, 179 (Ill. App. Ct. 2003). In <u>Conti</u>, one of the two plaintiffs "visited her internist for a physical examination because she was experiencing an upset stomach." <u>Conti</u>, 882 N.E.2d at 616. Her doctor noted that she might need an ultrasound and CAT scan of her abdomen, but put the tests on hold (presumably because she had no health insurance at that time). <u>Id.</u> He prescribed medication and asked her to call him if her condition worsened. <u>Id.</u> Less than a week later, the plaintiffs submitted a health insurance application to the defendant in which they answered "no" to the following

questions: (1) has any applicant been "advised" or "counseled," or "recommended for treatment," in the last ten years for any "digestive order or condition?;" (2) has any applicant in the last five years "had a physical examination (including check-ups), diagnostic tests, consulted a physician . . .?;" (3) has any applicant "been prescribed medication due to sickness" in the last twelve months?; (4) has any applicant "discussed or been advised to have treatment, testing, consulting, therapy, or surgery which has not yet been performed?" Id. Three days after completing the application the plaintiff returned to the doctor with new symptoms and was diagnosed with "possible diverticulitis," which a second doctor confirmed. Id. at 617. Approximately three weeks later the plaintiffs completed an "amendatory endorsement" that asked them to report any illness or physician consultations since they filed their original application. Id. The plaintiffs did not report the follow-up visits in the endorsement. Id. Not surprisingly, the Conti court concluded as a matter of law that the applicants had intentionally lied on their application. Id. at 620-21. In Pekin, the defendant signed an application for insurance stating that she did not "have animals or exotic pets." Pekin, 796 N.E.2d at 177. In fact, the defendant owned a dog. Id. at 178. The court concluded as a matter of law that the defendant "knew and believed she had a dog (a type of 'animal') when she signed the application." Id. at 179. Nevertheless, the court reversed

summary judgment because there was evidence that the insurer's agent had answered "no" for the applicant without consulting her. Id. at 280.

Sykes denies that he intended to deceive OneBeacon, and we do not believe that his stated belief is so unreasonable that we can take the issue away from a jury. First, there is evidence supporting the conclusion that he did not have the necessary intent to deceive when he actually signed the application. He could have reasonably believed that his voluntary disclosure of MFL's loan to the Pendolinos precluded any potential claim for fraud or dishonesty. And the Village Walk transaction arose *after* Sykes signed the application that Ritter had prepared. The inference that he deliberately did not update his answers to deceive OneBeacon is much weaker than the reasonable (almost inescapable) inferences that the courts drew in Conti and Pekin. The applications in Conti and Pekin called for truthful answers about easily verifiable facts: Do you have an "animal"? Have you seen a doctor? Cf. Golden Rule, 786 N.E.2d at 1017 (concluding that it was a disputed question of fact whether the applicant's father knew that his son had insurance coverage under another policy when he filled out the application on his son's behalf). In each case, the facts clearly contradicted the applicant's answers. OneBeacon claims that Sykes lied about questions calling for predictions about what might happen in the future ("*future* liability or bond

loss," "*potential* claims"). According to Sykes, he fully disclosed his interests in MFL and notified the Loan Committee that Village Walk had not repaid MFL on time. He further testified that he believed that the loan was a good fit for the bank. (See Def.'s Stmt. ¶ 51.) OneBeacon does not argue that the Village Walk Loan was so fundamentally unsound that the facts "clearly contradict" Sykes's optimism. OneBeacon is not entitled to summary judgment on its rescission claim.

### 2. The Adverse Interest Exception

The FDIC-R also argues that, even if Sykes did lie on the application, it is not bound by his misrepresentations. Ordinarily, an agent's knowledge is imputed to the principal. But courts have recognized an exception when the agent is acting for his own benefit and contrary to his principal's interests. See McRaith v. BDO Seidman, LLP, 909 N.E.2d 310, 331-32 (Ill. App. Ct. 2009) ("Generally, the knowledge and conduct of agents are imputed to their principals. An exception to this rule exists where the agent's interests are adverse to the principal.") (internal citations omitted); Lease Resolution Corp. v. Larney, 719 N.E.2d 165, 170 (Ill. App. Ct. 1999) (similar); Kinzer, 652 N.E.2d at 29. Whether an insured may use the "adverse interest exception" as a defense to a claim under 215 ILCS 5/154 appears to be a question of first impression in Illinois. Courts in other jurisdictions are split. Compare Puget Sound Nat'l Bank v. St. Paul Fire & Marine

Ins. Co., 645 P.2d 1122, 1126-29 (Ct. App. Wash. 1982) (recognizing the adverse interest exception as a defense to a claim for misrepresentation), with In re Payroll Express Corp., 186 F.3d 196, 209 (2d Cir. 1999) (reaching the opposite conclusion); see also BancInsure, Inc. v. U.K. Bancorp, Inc., 830 F.Supp.2d 294 (E.D.K.Y. 2011) (acknowledging the split of authority). Given this split of authority, and the lack of Illinois case law, it is unclear whether the Illinois Supreme Court would recognize the exception in this context. But it is unnecessary to decide this question now. Our ruling with respect to Sykes's intent to deceive is sufficient to deny OneBeacon's motion.

**D.    Collusion**

The Bond imposes special conditions on claims to recover losses stemming from loans:

> Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.  Such dishonest or fraudulent acts must be committed by an Employee with the intent:
>
> (a)  to cause the Insured to sustain such loss; or
> (b)  to obtain financial benefit for the Employee or another person or entity.
>
> However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee:
>
> (i) acted with the intent to cause the Insured to sustain such a loss;
> (ii) was in collusion with one or more parties to the transaction; and
> (iii) has received, in connection therewith, an improper financial benefit.

(Bond, Insuring Agreement (A), at OB 00017.)  OneBeacon argues that "parties to the transaction" means "the bank, as lender, and the customer, as borrower."  (Def.'s Reply at 18.)  The only Illinois case it cites, <u>Oxford Bank & Trust v. Hartford Accident & Indem. Co.</u>, 698 N.E.2d 204, 210 (Ill. App. Ct. 1998), referred to collusion between the bank's employees and the borrower.  But it did not hold (or even suggest) that the collusion *must* involve the borrower.[12]  The cases that OneBeacon has cited from other jurisdictions are similar.  <u>See, e.g.</u>, <u>Progressive Casualty Ins. Co. v. First Bank</u>, 828 F.Supp. 473, 475 (S.D. Tex. 1993); <u>Standard Chartered v. Milus</u>, 826 F.Supp. 310, 313 (D. Ariz. 1990).  None of these cases considered whether collusion with another party to the transaction, other than the borrower, satisfies this provision.  We believe that, as a direct and intended recipient of Wheatland's funds, MFL was a "party" to the Village Walk Loan "transaction."  <u>See</u> <u>Black's Law Dictionary</u> 1231 (9th ed. 2009) (A party is "[o]ne who takes part in a transaction."); (<u>see also</u> Escrow Trust Disbursement Statement, dated Dec. 31, 2007, at 1 ("Disbursements . . . payoff existing loan with: Mezzanine Finance LLC") (all caps omitted).)  If OneBeacon wanted to require collusion with the "borrower," or collusion between signatories to the "loan

---

[12]/ Ultimately, the court did not reach the collusion issue at all because it determined that the bank's loss did not arise from a "loan."  <u>See</u> <u>Oxford Bank & Trust</u>, 698 N.E.2d at 213.

agreement," it should have said so.[13]   A reasonable jury could

conclude that Sykes and Sundry colluded with MFL to shift the risk

of Village Walk's default from MFL to Wheatland.   Even assuming

that Sykes and Sundry were required to collude with Village Walk as

a condition of coverage, there is evidence supporting that

conclusion.   The parties agree that Venturella first proposed that

Wheatland pay off MFL's loan.   This evidence is bolstered by the

adverse inference we may draw from the fact that he invoked the

Fifth Amendment when asked whether he colluded with Sykes and

Sundry to procure the Village Walk Loan.   See LaSalle Bank Lake

View v. Seguban, 54 F.3d 387, 390 (7th Cir. 1995) (In a civil case,

the court may draw an adverse inference from the fact that a

witness has invoked the Fifth Amendment).   Without citing any

portion of his testimony, OneBeacon contends that Venturella also

"invoked the Fifth Amendment in response to a question [as to

whether] he did not collude with Sykes and Sundry."   (See Reply at

20 n.16.)   According to OneBeacon, this nullifies any inference

that a jury might draw from Venturella's silence.   It has not cited

any case law supporting this argument, which strikes us as dubious

on its face.   If Venturella invoked the Fifth Amendment in response

to a question that called for an exculpatory answer, then we may

_____

[13]/   The most that might be said for OneBeacon's position is that "one or
more parties to the transaction" is ambiguous, and that results in the phrase
being construed against the insurer.   See Country Mut. Ins. Co. v. Hilltop View,
LLC, 998 N.E.2d 950, 955 (Ill. Ct. App. 2013) (ambiguous policy terms are
"strictly construed against the insurer that drafted the policy").

draw an adverse inference that he could not answer the question affirmatively without perjuring himself. But it does not make sense to infer that Venturella invoked the Fifth Amendment to shield a response that was both exculpatory *and* *true*. Even assuming that OneBeacon is entitled to the "adverse" inference that it asks us to draw, a reasonable jury could weigh the evidence and instead draw the inference that the FDIC-R urges: Venturella invoked the Fifth Amendment because he did in fact collude with Sykes and Sundry.

**E.    Sealed Documents**

We gave the parties broad leeway to file summary-judgment materials under seal. We now conclude that this decision was erroneous. As far as we can tell, <u>none</u> of the voluminous materials that the parties filed under seal are sufficiently sensitive to justify secrecy. <u>Baxter Intern., Inc. v. Abbott Laboratories</u>, 297 F.3d 544, 545 (7th Cir. 2002) ("[T]hose documents, usually a small subset of all discovery, that influence or underpin the judicial decision are open to public inspection unless they meet the definition of trade secrets or other categories of bona fide long-term confidentiality."). However, we will give the parties an opportunity to argue that some subset of the summary-judgment materials should remain under seal.

## CONCLUSION

OneBeacon's motion for summary judgment [168] is denied.  A status hearing is set for April 9, 2014 to set a date for trial. By April 25, 2014, the parties may file a joint memorandum identifying particular portions of the summary-judgment record that they believe should remain under seal and explaining why.  If the parties do not file such a memorandum by that date, the court will unseal the entire record.


DATE:          March 31, 2014


ENTER:         _____
               John F. Grady, United States District Judge